This is Aaron Rabinowitz, Pro Bono Council, on behalf of Ricardo Blanco, and I'd like to reserve two minutes for rebuttal. Okay. Very good. Thank you, Your Honors. Your Honors, the facts in this matter are not disputed. Leading up to the 2017 presidential election in Honduras, Mr. Blanco participated in five political marches in opposition to the presidential candidate Juan Orlando Hernandez. The day after Mr. Hernandez's victory in that presidential election, Mr. Blanco participated in a sixth march. From that march, Honduran police abducted Mr. Blanco, took him to an abandoned house, where several police officers held him and beat him over the course of 12 hours. The police threatened to kill Mr. Blanco and his family and warned Mr. Blanco not to participate in any further marches. After these beatings, Your Honors, the police left Mr. Blanco in an abandoned lot, where he was rescued and was later taken to a hospital for evaluation. And Mr. Blanco learned later that others who had attended that very same march as he did were also abducted. Your Honors, over the next few months, the Honduran police sent multiple death threats. That's correct, Your Honor. That is what Mr. Blanco had understood. That is correct. Again, over the next few months, Your Honors, the Honduran police sent multiple death threats to Mr. Blanco at his home and at his work as well as by phone. And again, these threats warned of death to Mr. Blanco and his family if he continued his political activity or he remained in Honduras. And fearing for his life, his own life and his safety and his family's life and safety if he remained, Mr. Blanco left behind his one-year-old daughter and his daughter's mother and he fled Honduras for this country soon after he received the last of these death threats in this country. Mr. Rabinowitz, the immigration judge and the BIA both concluded that there was no past persecution here. Why were they incorrect in that regard? Thank you, Your Honor. For a few reasons, Your Honor. First of all, the board, excuse me, Your Honor, the board, well, the IJ and the board applied an incorrect legal standard, first of all. And second of all, they did not properly consider the record in the aggregate as this court's decisions have instructed. All right. What were the incorrect legal standards that you say that they applied on the question of asylum? Yes, Your Honor. So regarding the legal standard related to asylum, one of the error, excuse me, on the part of the board and now before this court is that the board determined that the death threats that Mr. Blanco received did not constitute past persecution because those threats were not imminent, concrete and menacing. Your Honor, that is not the correct legal standard. And as this court explained in Herrera-Reyes, the court's interest is not the imminence of the threat at all. Instead, the proper standard, the correct standard is whether the threats are simply concrete and menacing. There's not an element of imminence in that standard. And unfortunately, that's the standard that the board and now the government in his own briefing is applying. Herrera-Reyes had not been decided at that time. That's true, Your Honor. Herrera-Reyes was decided very soon after the briefing concluded in this case. I would note, Your Honor, that Herrera-Reyes did say that in some sense that had sort of been the standard all along. In other words, that although the court had used the word imminent, concrete and menacing, more frequently the court had used the words concrete and imminent interchangeably. In other words, that imminence was not really required. So you're absolutely correct, Your Honor. Didn't we actually say that imminence is just an element, a type of concreteness? Your Honor, I suppose I'm looking at Herrera-Reyes where it's said that concrete and imminent were used interchangeably or in the disjunctive. But then the court went on to say that imminence is a misnomer and that the court has neither required that the threat portend immediate harm or that the threat, that is, be in close temporal proximity to other acts of mistreatment. And then the court went on to say that the standard going forward should simply be referred to as concrete and menacing. What about the concern of the IJ for whether it suffered injuries or not? What do we do with that? I'm sorry, Your Honor, could you repeat that question? Yes, the IJ said that the beating was not severe and didn't end with any serious injuries. Should that concern us? Now, we have a recent case that you have provided a 28-J letter that impacts how we view it. Yes, Your Honor, that's right. You know, the board and the IJ, I think it's sort of intimated that although Mr. Blanco was beaten, because that beating didn't result in sort of permanent physical harm, that beating by itself did not constitute past persecution. And I guess about that I would say a few things. First, as you pointed out, Your Honor, there are recent cases that say that a finding of past persecution is not conditioned, again, not conditioned on whether the victim required medical attention or even on whether the victim was harmed at all. And that's in Herrera-Reyes and Sumela. So I suppose, Your Honor, that, you know, it is true that Mr. Blanco was not sort of permanently damaged or injured through this beating. But I don't think that that's not fatal to his claim, particularly in light of this Court's recent decision telling us that past persecution is not conditioned on whether the victim required medical attention. And, in fact, Your Honors – go ahead, please. Mr. Rabinowitz, tell me a little bit about – tell me about our standard of review here. I'm struggling to try to determine how we evaluate the findings of the BIA on this question of past persecution. Is it a question of law? And if it is, I understand that's de novo. But isn't there a cumulative factor to the evidence here that would require us to apply a more stringent and deferential standard of review? Yes, Your Honor. I guess I would – if – with your permission, I'll perhaps break that into a few smaller pieces. I guess first I would say that, related to your last point, Your Honor, yes, there is a requirement in this Court's decisions that the evidence be considered, as you said, cumulatively or in the aggregate. If – so as that – yes, the Board should have considered things in the aggregate, and it's our position that the Board did not. As far as standard of review, you know, as you said, there's de novo review when this Court is addressing the Board's legal determinations, and that's in Herrera-Reyes. I note also, Your Honor, that Herrera-Reyes – excuse me – that this Court also pointed out that where there's no dispute regarding the underlying facts, as we have in this case with undisputed facts, this Court reviews the Board's application of past persecution to those facts de novo. So it would be our position, Your Honor, that this Court does not owe particular deference to the Board here as the Board applied an incorrect legal standard and did not consider the cumulative effect of the undisputed facts. Well, what if we think that the IJ and the BIA just missed some things that we believe are important, such that in Herrera-Reyes the fact that people were killed in connection with both of these things, both the abduction and the later threats, people died, and Herrera-Reyes said that's important. The fact that it doesn't turn on injuries and the fact that the threat, the significance or sufficiency doesn't turn on whether it was fulfilled, both the IJ and the BIA seem concerned that, well, nothing really happened after the fact. Should we send this back? Should we remand this and say, pay attention to these things and then give us your view? How do we – what do we do with that? Yes, Your Honor. Thank you. In our view, I don't know that a remand for reconsideration, as you said, asking the Board to take certain things into account that it did not account for the first time around, I don't know that a remand with those instructions is needed. Again, it's our position, Your Honor, that the harm and mistreatment that Mr. Blanco suffered would constitute past persecution under – you know, under – you know, sort of under proper consideration. And I think – I would just point out, Your Honors, that this case is fairly well within the four corners of this Court's decision in Chavarria, where in that case the petitioner, just like Mr. Blanco, was abducted, left in an abandoned lot, and threatened with death. And in that case, Your Honors, this Court found that past persecution had taken place. Mr. Blanco's treatment is, in fact, even worse than Chavarria because in addition to the abduction, beating, and death threats, Mr. Blanco was beaten for 12 hours, which did not happen in Chavarria. So Mr. Blanco's, you know, treatment sort of exceeds what constituted past persecution in Chavarria. So I suppose, Your Honor, I don't know that a remand for the Board to look at facts that it overlooked the first time around would make a difference. I think that, you know, the facts on this record would support past persecution, you know, under a proper analysis. But the Board never considered whether he had a well-founded fear of future persecution. So even if we agreed with you on the existence of past persecution, we'd have to send this back for them to continue to evaluate the asylum and their withholding removal claims, would we not? Thank you, Your Honor. Your Honor, I would – I know my time is drawing short, so I will answer your question and then I'll stop, of course. I do know, Your Honor, at record page 8007, that the Board did say that Mr. Blanco did not establish a well-founded fear of future persecution and that he did not establish eligibility for withholding or for relief under the Convention. So the Board, Your Honor, with respect, did take these – those issues up and did find against Mr. Blanco. But he wasn't in a – the Board was not in a position to give Mr. Blanco the presumption that he would – he had a well-founded fear because they didn't find past persecution. That's correct, Your Honor. They did not find past persecution, so Mr. Blanco did not enjoy the presumption. I would say, Your Honor, that – and again, I want to be mindful of my – of the Court's time and I only have 30 seconds left. Thank you, Your Honor. I would say that, you know, again, as far as a well-founded fear of future persecution, you know, again, this is a government in Honduras that's shown Mr. Blanco and his family that the government is fully capable of physical violence and of locating Mr. Blanco, whether he's at home or at work, which I think underscores the likelihood of harm if he's returned to Honduras. So I – I think it is, Your Honor, that – Well, I understand your argument, but you may be misconstruing my question. I don't know that we can do that based on this record. My question was directed to whether or not we don't have to at least send this back to have the BIA and the immigration judge develop the record further on the question of future well-founded fear. Yes, Your Honor. Thank you for – go ahead, please. Go ahead. You can answer. Thank you, Your Honor. Yes, no, I think I better appreciate your question, Your Honor. I appreciate it. I suppose I'd say, Your Honor, that I think that past persecution – again, I think the Court probably understands our position that past persecution is well – sort of well shown here. And for that reason, I think asylum is satisfied. So I'm not sure that – I'm not sure that we really need to go much further to further develop the record. I think the record is developed as it is. Before we let you go, we've talked about the abduction, but we haven't talked at all about the three letters and the telephone call. So let me ask you how the threats that Mr. Blanco received are different from, for example, the unfulfilled threats that we discussed in Lee. That was the case of the Chinese woman who had a couple of children, and they threatened that if she had any more, she would be – she would suffer physical violence and other threats that were eventually unfulfilled. Yes, Your Honor. So I understand your question. I think in – excuse me – in addressing the threats, again, these threats are – you know, again, these are threats that are issued sort of in the context of violence. I mean, Mr. Blanco had been abducted and beaten and was threatened at that time, and the threats continued. And I would say that, you know, as this Court has – excuse me – has said, again, in Herrera Reyes and Sumela, there's no requirement that the threats sort of foretend immediate harm. Or – and again, in Sumela, there's, you know, past persecution – I'm sorry, the Court had written that – the Court has never held that persecution requires more than one incident. So – and again, the Court even said that they've left open – the Court's left open the possibility that a single incident, if sufficiently egregious, may constitute persecution. So I guess, Your Honor, I would say that the threats are, you know, are sort of, you know, quite menacing in the fact – given that they're coming from, you know, government actors who have shown that they're capable of abduction and then violence. So I think that those threats just, you know, sort of substantiate the menace and the fear that Mr. Blanco and his family were experiencing. Okay. Thank you. We'll hear back from you on rebuttal. Thank you so much. Good morning, Your Honors. May it please the Court, Amita and Sumela, on behalf of the Attorney General. Your Honors, in this immigration case, Mr. Blanco's experiences may be characterized as harassment or intimidation. But opposing counsel is incorrect in saying that the agency didn't apply the correct legal standard. And when you look at the record at AR3 and AR4, the agency, the Board, specifically says it's considering the facts in the totality. It's considering the evidence of past harm cumulatively. And again, at the end of the paragraph on AR4, it says overall. And these words show that the agency is applying the very standard that this Court laid out in Chavarria, which was then confirmed and elaborated in Sumela, or rather Doe, versus the Attorney General and Herrera-Reyes, Does it use the concrete and menacing standard? Yes. Yes, Your Honor, that's the concrete and menacing. And the Court explained in Sumela that a threat is concrete when it's corroborated by credible evidence, and it's menacing when it reveals an intention to inflict harm. And in this case, looking at that standard and also comparing the facts in this case to the case law, like Sumela, Mr. Blanco's case is just not – it's not on the same – you know, it's not on the same – it can't be said to be on the same thing. In Sumela, the threats were contemporaneous. There was a sense of escalation or heightened severity in that he was being doused with kerosene while being beaten, and there was a discussion about whether or not he should be killed, beheaded, while somebody brandished a cutlass, or whether he should be burnt to death. In Mr. Blanco, there wasn't this thing – Just because there's another case with perhaps more severe, you know, conduct or situation, doesn't mean that this wouldn't rise to that situation. I'm bothered, quite frankly, by the fact that neither the IJ or the BIA mentioned the fact that there were actual killings connected both with the abduction incident and some of these people who'd received similar threats like Blanco did later. There were killings in association with that, and Ferreira Reyes says that that's important. And a couple of things just seem to be missed. The fact that they were concerned about the physical harm, where we've said in Sumela it doesn't matter. They seem concerned that 14 months went by and nothing happened, and Sumela says that sufficiency doesn't turn on whether it was fulfilled. I mean, it seems to me a lot of the things that we, you know, don't care about, they were hanging their hat off. So, Your Honor, just at the outset, the board doesn't have to, you know, doesn't have to write an exegetic or include every point as long as it's shown that it has considered the evidence as a whole and applied the correct standard, which it has, looking at everything. When it says it was nothing more than harassment, I'm not sure that they really did consider the evidence appropriately. I mean, that's what the BIA said. It was more akin to harassment. Yes, Your Honor, and the agency, just I hear your concern about the agency maybe, there's an impression that the agency overlooked certain evidence, but I think, or not I think, what the agency is saying is that looking at, they're not looking at physical harm in isolation. The board is saying that, yes, there are sites in Chavarria where a petitioner, the circuit found that an individual did not have to suffer from physical harm in order to satisfy the past persecution element, and they're saying that physical harm in isolation, like that's not a factor. But they're still saying that persecution is a severe concept. It's something, you know, it doesn't include harassment, intimidation, or even acts that might be unconstitutional or unjust. It has to be something that's offensive and severe. And, yes, while Simayla might be at one end of the spectrum where, you know, in terms of the past, the harm, Mr. Blanco, the agency is saying, is on the other end of the spectrum in that he had this beating or this incident with the police. There was no testimony, unlike Rhea or Simayla, of any harm or physical injury or other. How would you distinguish Chavarria? So I would say that Chavarria, even though there was no physical harm, but it was concrete and menacing in that a gun was held. The petitioner there had a gun held to his head while he was robbed and warned that the next time that wouldn't happen to him. And he testified credibly that the same individuals who had witnessed him helping the ladies who were members of the NGO were the same people who had him under surveillance and the same people who then robbed him. But in this case, the difference, I would say, it's not concrete and as menacing because there's not – the record doesn't show the brandishing of the weapon while he's being threatened. And he received three letters over the course of a year after that beating. He was masked and taken to an abandoned house and beaten over 12 hours. Yes, Your Honor. And the testimony, again, just to step back and said when considering the totality and considered cumulatively and overall. So the agency isn't just looking at that beating. They're looking at this initial incident where there was a beating. And unlike Camila, where there was injury to the head and the back and blood from his mouth and where that didn't exist, and then in looking again over the course of the next year when Mr. Blanco received three letters which don't satisfy this concrete or menacing intention in that he wasn't harmed, his family wasn't harmed after that. Well, but the case law says harm doesn't matter. Right, Your Honor. But again, just taking back, again, the court standard as I understand it, which is looking at the evidence in the totality of the record. Chavarria, to me, seems more severe in that there's an immediacy. The gun is being held to his head and they're saying, I will kill you, compared to... Your Honor, the threats that Blanco received in the letters and in the phone call were conditioned on him leaving Honduras. He was told if he didn't leave Honduras and quit protesting, he'd be killed, and he did. So, how can that be discounted? Well, Your Honor, I would say that it isn't to be discounted, but again, looking at all the evidence where he says he spoke with his family after, and his family, there's no record or testimony in the record that the police are still looking for him. He didn't testify... They told him to leave, left. Right, but he didn't testify, Your Honor, that he would participate in further marches upon his return. The record doesn't show that. The record doesn't show that, and this might go more toward the Well-Founded Fair chapter, that LIBERC party members are being harassed, or not harassed, rather, but persecuted. The U.S. Department of State report doesn't show... He says a list of people in the LIBERC, or people who participated in marches, is being kept by the police. The record doesn't show this, and this goes to the concrete element that it's corroborated by credible evidence. There's no mention of that in the U.S. Department of State record, or any of the evidence that Mr. Blanco submitted, and it's his burden to meet, Your Honor. And so, he doesn't show that he's going to return and continue marching. He hasn't shown that... Didn't the IJ find him credible? Yes, Your Honor. The IJ found Mr. Blanco credible, but... But Mr. Blanco said that there were people he knew who were part of the LIBERC party that were killed. Yes, Your Honor, but just significantly, if I may point, Your Honor, to page 98 of the record, while the judge finds him credible, the IJ says that much of his testimony appears to be speculation as to who sent the letters and who made the threatening call. And there's a complete lack of corroborating evidence on that part. I understand that, but the record does not go on to say that because of that, we question whether or not fellow party members were killed. No, Your Honor. Well, I would say that it's Mr. Blanco's burden to show that there's a reasonable possibility that he will suffer persecution. What do you say our standard of review here is? How do we look at this case? So, Your Honor, this is a deferential standard and it's a substantial evidence standard that this court should use to review the evidence. And under that standard, petitioner would have to show evidence that would compel a reasonable adjudicator to reach a contrary conclusion. And I would respectfully say, Your Honor, that Mr. Blanco just hasn't met that standard. He hasn't shown that these threats were concrete in terms of them being corroborated by credible evidence, and he hasn't shown that there were menacing. There was no intention to inflict harm on him. He received letters that were hand-delivered to him. One letter came through his boss. As I said, the IJ found that it was speculative in terms of him knowing who sent the letters. When he was asked by the IJ, he says, well, I think it was the same police because the handwriting is all the same. And he further says, well, the police gave the letters to someone, and he refers to just a general or rampant corruption as the reason for his belief that the police sent these letters. But in terms of looking at the standard, which the agency applied it in, and it doesn't need to be remanded, as Judge Rendell pointed out, the Myla and Reyes were issued after the agency issued its decision. But more or less, it's the same concrete and menacing standard. But if the agency relied on certain aspects that we find are impermissible, can we not reverse once we take those aspects out of the record, such as failure to notice that people were killed, relying upon no injuries, relying upon the fact that threats weren't carried out? Doesn't that give us the ability to find differently as a matter of law, applying the correct reasoning and analysis? So I would absolutely disagree with Your Honor in the sense that if the agency had looked at those factors in isolation, then maybe. But in a circumstance like this, where the agency has looked at the aggregate effect of several factors, of all these factors, looking at the record in the totality of the record, and again, pointing out that the agency doesn't have the right. But if the agency's totality weighs certain facts differently from the way we say they should be weighed, perhaps even not at all, then can we not correct that? Your Honor, if the court feels that the agency did not apply the correct standard in looking at the totality or looking at the evidence in the cumulative reason, according to this court's law, then that would be an error, which I don't believe is the case here for the reasons stated. And looking at the very specific language of the agency decision, where it specifically cites the chavarria, it mentions a number of factors. It might not have mentioned all of them, but the agency says, considering the record in the totality and considering it cumulatively, and the agency, there's a presumption of regularity, the agency is not required to list every factor just to show that it has done a review of the record properly, then I would say that the decision or the agency decision should stand or that Mr. Blanco hasn't shown evidence that would compel the court to reach a contrary conclusion, Your Honor. Okay, thank you. I'm so sorry. Thank you. Mr. Rabinowitz? Yes, thank you, Your Honor. In my rebuttal, I just want to touch on a few things. We heard, Your Honor, we heard government counsel say a few times that the board properly considered the evidence in its totality, and I think we heard government counsel say that the board used words like cumulative and totality in the board's decision. I would point out, Your Honor, that those are merely words that the board used, and as this court wrote in Herrera-Reyes, and I'm quoting here, a cursory invocation of the word cumulative is insufficient, and I believe, Your Honor, that's what happened in this case. As we've heard earlier in these proceedings, others who attended the same march as Mr. Blanco were harmed and abducted and killed. The board did not address this, and again, the immigration judge did not find Mr. Blanco not credible. That's the first thing. The second thing, Your Honor, is the government's counsel said the persecution is a severe concept. In this case, again, we're talking about an abduction, a beating, and follow-up death threats, all of which are severe. We heard some discussion, Your Honor, about Chavarria. What I did not hear, Your Honors, with respect is I did not hear the government distinguish that case. Mr. Blanco, his treatment was worse than the treatment that the petitioner in Chavarria suffered, and the petitioner in Chavarria was found to have suffered past persecution. So, again, here, Your Honors, we have a situation that's even worse off than a case where past persecution was found. Let me ask you about the other killing because I think in Herrera-Reyes, the issue was the petitioner was very politically active, didn't just attend a march, but was very politically active, and the person who was killed was a close associate, a political compatriot, not just a member of the same party, not just someone who was at the same march, but someone who was close to the petitioner. So how was, in Blanco's case, how was the – I don't know who the other person was who was killed, but is there any – are they substantially similar in any respect other than the fact they both supported the Libre Party? Your Honor, I don't know that the record tells us – I appreciate the question. I don't know, Your Honor, that the record gives us any details about the other victims, but just as you said, the other victims were participating in the same march. And it's interesting because the board wrote in its decision that Mr. Blanco participated in only, quote, relatively limited political activities, and I think it's very telling, Your Honors, that even these very relatively limited political activities were enough to incite or sort of result in his abduction, beating, and death threats. So we don't have any details about the other victims, but as you said, they are similarly situated to Mr. Blanco. Okay. Are there any other questions? No. No. Okay. Thank you very much, counsel. Thank you, Your Honor. Thank you very much, Your Honors. Thank you.